IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>  )<br>  Plaintiff,  )<br>  )<br>vs.  )  Cr. No.  20-1867-MV<br>  )<br>**JOSHUA GUTIERREZ**,  )<br>  )<br>  Defendant.  ) | |

UNITED STATES' SENTENCING MEMORANDUM AND RESPONSE
TO DEFENDANT'S FACTUAL OBJECTIONS

The United States submits this sentencing memorandum and response to Defendant's factual objections to the presentence report.  The United States respectfully requests that the Court accept the plea agreement and sentence the defendant, Joshua Gutierrez, to a 12-year term of imprisonment.  In support, the United States asserts the following:

BACKGROUND

On March 29, 2020, the defendant, Joshua Gutierrez, was spending the night at the home of his girlfriend, C.P., and her father, L.P.  (PSR ¶¶ 16-17; Doc. 25 ¶ 9.)  In the early morning hours, Defendant shot and killed John Doe, another guest who was visiting the home.  (*Id.*)

The shooting was motivated, at least in part, by Defendant's long-standing dislike of John Doe, who was C.P.'s ex-boyfriend and the father of C.P.'s child.  (PSR ¶¶ 16-17.)  As Defendant explains it in his sentencing memorandum, "[t]here was bad blood between [Defendant] and John Doe due to [C.P.]'s former relationship with John Doe."  (Doc. 32 at 3.)  That is putting it mildly.  In fact, Defendant's fury against John Doe was so great that Defendant had previously attacked John Doe and threatened John Doe's entire family.  (*See* Navajo Nation Incident Report

3-19-028062, attached as Gov. Exh. 1.) Defendant alludes to this history in his sentencing memorandum several times (Doc. 32 at 3-5), but completely fails to mention his role as the author of the conflict. Defendant makes it sound like John Doe had previously stabbed him for no reason. (*Id.*) This could not be further from the truth. According to tribal police reports, on October 2, 2019, Defendant went to the home of John Doe and his family. (Gov. Exh. 1 at 5-6.) Defendant knocked on the door of the home with a large metal pipe, which mimicked the appearance of a firearm. (*Id.* at 6.) Defendant was yelling and threatening to kill everyone in the house. (*Id.*) Defendant broke the screen door. (*Id.*) John Doe's mother, J.P., was present in the home at the time of the offense as were her minor grandchildren. (*Id.*) She was terrified for the children's safety. (*Id.*) To protect the household, J.P.'s partner, A.L., and some other male members of the family went outside to drive Defendant away. (*Id.*) A fight ensued. (*Id.* at 5-6.) During this fight, Defendant was stabbed. (*Id.*) Notably, Defendant did not provide a statement to tribal police at the time of the fight saying who stabbed him.[1] (*Id.*) The police did not open a criminal case involving the stabbing as they determined Defendant was the instigator of the fight. (*Id.* at 5, concluding that Defendant was battered by the homeowner of the residence he was trying to break into).[2] In other words, it was Defendant who went after and attacked John Doe, not the other way around.

   The events of March 29, 2020 are consistent with this history. On March 29, 2020, John Doe went to L.P.'s house for purely innocuous reasons; he was not seeking out Defendant to hurt or fight him. (PSR ¶ 17.)

---

[1] In his March 29, 2020 post-arrest interview, after the death of John Doe, Defendant indicated that it was John Doe *and* John Doe's brother, M.K. who had stabbed him in October 2019.

[2] On December 16, 2020, the United States emailed probation and defendant and informally requested that probation include this background information in Paragraph 48 the PSR. Probation responded that it would look into adding the requested information and will be added by way of addendum.

Rather, John Doe was part of a group that wanted to "kick back" with L.P. (*Id.*) The group included John Doe's brother, M.K., John Doe's cousin, J.L., and M.K.'s girlfriend. (PSR ¶ 12.) The group arrived at L.P.'s house in the early morning hours of March 29, 2020 after a night out. L.P. invited the group into his room to drink, smoke, and hang out. (PSR ¶ 17.)

The group initially stayed in L.P.'s room without incident. At some point, however, John Doe and his brother, M.K., started arguing with each other and wrestling around. (PSR ¶¶ 12, 17.) Hearing the fight, C.P. went to her father's room and told everyone to leave. (PSR ¶ 16.) L.P. agreed it was time for the group to go. In accordance with this request, John Doe's cousin, J.L., intervened in the fight and told John Doe, "Let's go." According to L.P., John Doe responded, "All right. Let's get the hell out of here."[3] At that point, John Doe and J.L. left L.P.'s room and started walking down the hallway headed out of the house. (PSR ¶ 13, 15.)

Almost immediately after leaving the room, John Doe ran into Defendant who had armed himself with a gun and come to the room to challenge the group. (PSR ¶¶ 13, 15; Doc. 25 ¶ 9.) There was a brief, only seconds long, confrontation between Defendant and John Doe. (*Id.*) The witnesses of the confrontation have differing memories of exactly what happened.

Defendant told police that John Doe swung at him and "grazed" his face.[4] Defendant explained that he then "panicked" and shot John Doe. (PSR ¶ 19.) C.P. gave a similar account of the shooting. She told police that John Doe swung and hit Defendant as he was walking down

---

[3] The PSR contains a short summary of L.P.'s account of the night. The United States has provided the defense and probation with a recording of this statement which is Bates Numbered 187a. The information provided above comes from this recording.

[4] This information comes from the recording of Defendant's post-arrest interview, which has been provided to defense and probation as Bates Number 181a. The PSR contains a shorter summary of this interview.

3

the hallway. (PSR ¶ 16.) As she saw it, Defendant then "got mad" and shot John Doe.[5] The only other witness to the shooting was J.L. (L.P., M.K. and M.K.'s girlfriend were all in L.P.'s room at the time of the shooting, where they could hear but not see the incident). J.L. has given varying accounts of the shooting.[6] On the morning of the crime, J.L. told police that he "thought" John Doe gave Defendant a "shove" immediately before Defendant shot John Doe, but he was not entirely sure. This interview occurred immediately after John Doe died in J.L.'s lap. In a later statement, after the stress of the moment had passed, J.L. indicated he did not recall seeing any physical altercation between John Doe and Defendant before the shooting.

The government believes that the best reading of the evidence is that John Doe briefly swung at, lunged at, or shoved Defendant as they were passing each other in the hallway.

Critically, this altercation was fleeting and ungainly. All of the witnesses agreed that Defendant rapidly shot John Doe within seconds of John Doe leaving L.P.'s room. (PSR ¶¶ 13, 15, 17-17, 19.) John Doe did not wage a sustained physical assault on Defendant prior to the shooting. (*Id.*) By Defendant's own account, John Doe's blow was clumsy and misplaced.[7] This blow caused Defendant little to no injury. Under these facts, it was not reasonably necessary for Defendant to resort to the most extreme form of deadly force – shooting a man in the chest – to prevent death or great bodily harm to himself. John Doe was a nuisance and an irritant, not a serious threat to Defendant's safety. John Doe was unarmed. (PSR ¶ 19.) He was already on his way out of the house. The shooting was avoidable and unnecessary.

---

[5] The full recording of C.P.'s statement can be found at Bates Number 49a.
[6] J.L.'s statements can be found in the previously produced discovery at Bates Numbers 334 and 614-632.

[7] *See* Bates Numbers 181a and 181b (wherein Defendant describes how John Doe tried to swing at him and grazed his face, kind of hitting him).

So were Defendant's subsequent actions.  After shooting John Doe, Defendant turned his gun on John Doe's brother and cousin and threatened to shoot them too, if they did not leave the house.  (PSR ¶ 13; Doc. 25 ¶ 9.)  J.L., a teenager, did not deserve this conduct.  J.L. was a completely innocent bystander, who did nothing to antagonize Defendant or escalate the situation.  (PSR ¶¶ 12-14.)  After Defendant shot John Doe, J.L. responded bravely, working with M.K. and L.P. to remove John Doe from the house and take John Doe to the hospital.  (PSR ¶ 14.)  Defendant made this process exponentially more difficult by putting J.L. in fear that he might be killed at any moment as he was helping transport John Doe out of the house.  Sadly, J.L. and M.K.'s efforts were in vain.  John Doe died in J.L.'s lap on the way to the hospital. (PSR ¶ 11.)

On October 15, 2020, Defendant pled guilty to voluntary manslaughter, in violation of 18 U.S.C. § § 1153 and 1112, and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (Doc. 25.)  In entering the plea agreement, Defendant affirmatively waived any claim of self-defense.  (*Id.* at 5.)

THE SENTENCING GUIDELINES CALCULATION

On December 8, 2020, United States probation issued a Presentence Report ("PSR") calculating Defendant's guideline range as 190 to 207 months of imprisonment. (PSR ¶ 69.)  The government agrees with the guideline calculations contained in the PSR.

DEFENDANT'S OBJECTIONS TO THE PSR

In his sentencing memorandum, Defendant requests five "factual corrections" to the presentence report.  (Doc. 32 at 4-5.)  With the clarifications outlined below, the United States does not object to the proposed corrections.

First, Defendant rightly notes that the summary of J.L.'s statements contained in the presentence report omits J.L.'s statement that John Doe may have shoved Defendant prior to the shooting.  Paragraph 12 of the presentence report states that J.L. "made no mention of an assault or attempted assault by John Doe towards Gutierrez."  (PSR ¶ 12.)  This is only partially correct.  As Defendant points out, J.L. has given varying accounts of the shooting.  Like several of the other witnesses, including Defendant's girlfriend C.P. (PSR ¶ 16), J.L. initially denied seeing the shooting.  J.L. quickly had a change of heart and related the account of the shooting currently summarized in Paragraphs 12-13.  (Doc. 32 at 4.)  When the interviewing agent pushed J.L. to explain why Defendant shot John Doe, J.L. responded that he thought John Doe may have pushed or shoved Defendant, but he was not entirely sure.  (Bates No. 334.)  In a later statement, J.L. averred that he did not recall any physical altercation prior to the shooting.  (Bates No. 614-632.)  The government has no objection to all this information being included in the PSR.

Second, Defendant objects to the Court crediting L.P.'s statement that Defendant is in a gang.  Defendant claims that he is not a gang member.  (Doc. 32 at 4.)  The government does not know whether Defendant is telling the truth.  The government agrees, however, that Defendant's sentence should not be enhanced on this basis.  While it is correct that L.P. stated he believed Defendant was in a gang, L.P. did not know the name of the gang.  This sort of bare, unspecified, allegation is not the type of information the Court should rely on at sentencing.  *See* U.S.S.G. § 6A1.3 (courts may rely on hearsay at sentencing "provided that the information has sufficient indicia of reliability to support its probable accuracy"); *United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir. 1990) (due process requires that hearsay have "some minimal indicium of reliability beyond mere allegation").  The Court may either excise this sentence from the PSR or decline to credit it for sentencing purposes.  *See* Fed. Crim. P. 32(i)(3)(B) ("for any disputed

portion of the presentence report," the court may "determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing.").

Third, Defendant insists that John Doe "actually assaulted" him as opposed to attempting to assault him. This is an objection without much significance. The PSR already acknowledges that John Doe punched Defendant. (PSR ¶¶ 16, 86.) The "attempt to assault" language in Paragraph 19 simply tracks the language of Defendant's own confession; Defendant told police that he shot John Doe because John Doe "tried" fighting him. (Bates No. 181a.) Whether this is best categorized as an assault, a battery, or an attempted assault, depends on niceties of tribal law that have no bearing on sentencing. The Court should sentence Defendant based on the facts. To that end, the government has no objection to replacing the challenged "attempt to assault" language with a direct quote from Defendant's own statements. For example, the first sentence of Paragraph 19 could be amended to read that Defendant "provided a post Miranda statement in which he explained that he shot John Doe because John Doe tried fighting him." Or, Defendant "provided a post Miranda statement in which he explained that he shot John Doe because John Doe swung at him and grazed his face." [8]

Defendant's fourth and fifth objections relate to information primarily within his knowledge. Defendant asserts that he would welcome the opportunity to receive mental health and substance abuse treatment. (Doct. 32 at 5.) Defendant also notes that he does not have a child. (*Id.*) The government does not object to either clarification. These objections do not impact the guideline calculations or the government's sentencing recommendation.

---

[8] In a second interview, Bates Numbered 181b, Defendant described the events immediately prior to the shooting saying that John Doe "tried" to swing at him and "kind of got him." This is consistent with Defendant's plea colloquy. (Doc. 25 ¶ 9.)

PLEA AGREEMENT

The plea agreement contemplates Defendant pleading guilty to the voluntary manslaughter of John Doe with the government forgoing additional charges for Defendant's subsequent assault on John Doe's brother and cousin. The government respectfully requests the Court accept this agreement. As the Supreme Court has recognized, "[t]he potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties." *Missouri v. Frye*, 132 U.S. 1399, 1407 (2012). Parties in a criminal case must assess the likely outcome of motions and trial practice. Defendants must weigh their tolerance for the risk of losing a trial against the benefits of a negotiated settlement. Likewise, counsel for the United States must weigh the risks of proceeding to trial.

In negotiating Defendant's plea agreement, the United States considered the evidence, the viability of Defendant's claim of self-defense, and the views of both victims. John Doe's next-of-kin, his mother, understandably wanted to see Defendant serve a life sentence for shooting and killing her son. At the time of the change of plea, she expressed that she was not happy with the plea agreement, which she viewed as too lenient. The government is sympathetic to this position and understands her pain.

The government, however, believes that the proposed plea agreement represents a reasonable and just outcome in this case. The proposed plea agreement holds Defendant accountable for the death of John Doe and the terrorizing of John Doe's relatives by requiring Defendant to serve a significant prison sentence. The plea provides justice to J.L. by obliging Defendant to admit to assaulting J.L. and pay restitution for this conduct. (Doc. 25 ¶¶ 9, 16.) At the same time, the plea agreement acknowledges John Doe's role in the offense and the potential

that a jury would credit Defendant's claim of self-defense.  In short, the plea recognizes that Defendant had a potential, though not viable, claim of self-defense.  The United States asks this Court to accept Defendant's plea agreement.

ARGUMENT

As this Court is well-aware, the United States Sentencing Guidelines are advisory.  *See United States v. Booker*, 543 U.S. 220, 234 (2005).  In determining a sentence, the district court must consider both the Guidelines and the factors set forth in 18 U.S.C. § 3553(a).  *Gall v. United States*, 552 U.S. 38, 51 (2007). Under this framework, an appropriate sentence is one that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct, protects the public from further crimes of the defendant, and provides the defendant with needed educational or vocational training, medical care or other correctional treatment.  18 U.S.C. § 3553(a)(2)(A-D); *Booker*, 543 U.S. at 261-62.  Specific factors relevant to the sentencing analysis include the nature and circumstances of the offense and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a)(1-7).  For the reasons set forth below, a 12-year sentence is a proper sentence in this case.

Defendant has admitted to shooting and killing John Doe.  As outlined in detail above, the shooting was an excessive and catastrophic response to John Doe swinging or pushing at Defendant.  Far from exonerating him, Defendant's history of "bad blood" with John Doe supports imposing a 12-year sentence.  Defendant's shooting of John Doe was the outgrowth of a feud fueled by Defendant's own violent conduct.  Six months prior to the shooting, Defendant went to John Doe's house and threatened John Doe and his family with a large metal pipe that was made to look like a firearm.  (Gov. Exh. 1.)  This vicious attack petrified John Doe's family.

(*Id.* at 6.) The Court should reject Defendant's attempts to use the attack and its attendant consequences as a shield to justify Defendant's subsequent killing of John Doe.

Defendant's conduct in both October 2019 and on March 29, 2020 indicated a desire to hurt John Doe and a willingness to injure or scare his family in the process. Defendant's behavior on March 29, 2020 went far beyond what was reasonably necessary for self-preservation. After rashly shooting John Doe in the chest, Defendant pointed his gun at John Doe's teenaged cousin. J.L. will live with the traumatic effects of this night for the rest of his life. Defendant's own expert agrees that this kind of trauma can be extremely damaging. (Doc. 32-2 at 9.) A 12-year sentence appropriately reflects seriousness of the offense and the harm to the victims, while also balancing Defendant's history and characteristics, the conduct of John Doe, and the other § 3553(a) factors.

## CONCLUSION

A 12-year sentence is "sufficient, but not greater than necessary to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a). WHEREFORE, the United States respectfully requests that this Court accept the plea agreement and sentence the Defendant to a term of imprisonment of 12 years followed by a term of supervised release of at least 3 years.

Respectfully submitted,

FRED J. FEDERICI
Acting United States Attorney

*Electronically filed on February 26, 2021*
ALLISON C. JAROS
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico  87103
(505) 346-7274 phone
(505) 346-7296 fax

I HEREBY CERTIFY that on the 26th day of February, 2021, I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel of record to be served by electronic means on this date.

*/s/*_____
Allison C. Jaros
Assistant U.S. Attorney